UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAIME DEAN CHARBONEAU,<br><br>                    Petitioner,<br><br>        v.<br><br>AL RAMIREZ,<br><br>                    Respondent. | Case No. 1:17-cv-00364-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is a successive petition for writ of habeas corpus[1] filed by Idaho prisoner Jaime Dean Charboneau ("Petitioner," "Jaimi,"[2] or "Charboneau"). The successive petition challenges Petitioner's 1985 Jerome County conviction for first-degree murder. Respondent has filed a Motion for Summary Dismissal, which is now ripe for adjudication.

The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by Respondent. *Dkt. 30, 40. See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 n.1 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

---

[1] The Court construes both Petitioner's original successive petition (Dkt. 3) and his amended successive petition (Dkt. 9) together as a single petition. *See* Dkt. 11 at 1.

[2] In his submissions in this Court, Petitioner spells his name "Jaime," though some state court records use the spelling "Jaimi."

MEMORANDUM DECISION AND ORDER - 1

For the reasons set forth in this Memorandum Decision and Order, the Court concludes that the claims in the successive petition are barred by 28 U.S.C. § 2244(b)(2).[3] Accordingly, Respondent's Motion for Summary Dismissal will be granted, and the successive petition dismissed with prejudice.

## BACKGROUND

Petitioner was convicted of the first-degree murder of his ex-wife, Marilyn Arbaugh. The facts of Petitioner's case are set forth at length in two Idaho Supreme Court decisions. *See State v. Charboneau*, 774 P.2d 299 (Idaho 1989) (*Charboneau I*) (affirming conviction, affirming denial of first and second post-conviction petitions, and remanding for resentencing), *overruled in part on other grounds by State v. Card*, 825 P.2d 1081 (Idaho 1991); *Charboneau v. State*, 395 P.3d 379 (Idaho 2017) (*Charboneau V*) (reversing grant of fifth post-conviction petition). Under 28 U.S.C. § 2254(e)(1), the following facts, as found by that court, are presumed correct and can be rebutted only by clear and convincing evidence:

> Jaimi and Marilyn lived together for approximately two years before they were married in June 1983. Marilyn had two teenage daughters, Tiffnie and Tira. The relationship between Jaimi and Marilyn was stormy. There is evidence that Jaimi physically abused Marilyn. In August 1983 Marilyn shot Jaimi with a .22 caliber pistol during a dispute. An aggravated battery charge was filed against Marilyn but was subsequently dismissed on the motion of the prosecuting attorney. In the spring of 1984 Marilyn filed for divorce. A default judgment was granted on June 13, 1984. There is evidence that Jaimi and

---

[3] Because the Court concludes that the petition is barred by § 2244(b)(2), it need not address Respondent's other arguments in support of dismissal.

Marilyn continued to see each other and were sometimes intimate after the divorce.

On June 21, 1984, Jaimi went to the cafe where Marilyn worked. They left in Marilyn's car. There is some dispute whether Marilyn went with Jaimi voluntarily. The next day Marilyn reported to the police that Jaimi had kidnapped and raped her and had stolen her car. There is evidence that Jaimi travelled to Nevada after June 21. The burned remains of Marilyn's car were found in southern Idaho in late June 1984.

*Charboneau I*, 774 P.2d at 302–03. Charboneau was charged with kidnapping and grand theft based on this incident.

On June 28, 1984, "Jaimi purchased a .22 caliber rifle from a hardware store in Gooding, Idaho." *Id*. at 303. This rifle will be referred to as "the Remington rifle."

Three days after Charboneau purchased the rifle, Marilyn was shot and killed:

About mid-morning on Sunday, July 1, 1984, Marilyn returned to her residence on a ranch near Jerome, after being gone since the evening before. Some time after 11:00 o'clock that morning Marilyn went out to check some horses in a corral near her home. Shortly after that Marilyn's daughter Tiffnie heard shots outside, grabbed Marilyn's .22 pistol, and went to see what had happened. She found her mother sitting on the ground in the barn with blood on her. Jaimi was standing close to Marilyn with a .22 caliber rifle pointed at Marilyn. Tiffnie asked Jaimi to leave and told him she was going to call the police. Jaimi told Tiffnie that he would take Marilyn to the doctor. Both Marilyn and Jaimi told Tiffnie to leave.

At 11:38 that morning Tiffnie called the Jerome County Sheriff's office and said that Jaimi had shot her mother. Tiffnie then told her sister Tira about the shooting, and they both got dressed. They heard more shots and ran outside where they hid behind a sheep wagon and called to their mother.

*Id*.

At this point, "Tiffnie had her mother's .22 caliber pistol with her, and it accidentally discharged behind her." *Id*. Tiffnie then "ran into the house, hid the [.22 pistol], returned to the sheep wagon, and then ran to the barn. Tira followed close behind." *Id*.

The girls found Marilyn "lying on her back with her arms over her head." *Id*. Tira called for an ambulance:

> At 11:42 a.m. Tira telephoned for assistance and reached the Jerome County Sheriff's office. She told them to get an ambulance and that her mother was dying. When the sheriff's deputies arrived at the scene, they found Marilyn's body in the barn and located Jaimi in a field near the barn with a .22 caliber rifle [the Remington rifle] lying nearby.

*Id*. "At the time of his arrest, Jaimi acknowledged that he had shot Marilyn, although he stated that he did so because she was going to shoot him." *Id*.

Petitioner was charged with first-degree murder, and the murder charge was consolidated with the kidnapping and grand theft charges. Petitioner did not testify at trial. Petitioner's defense "was designed to convince the jury that [Petitioner] shot Marilyn but did not kill her, or, that if he did kill her, he did not intend to. The defense argued that the killing did not amount to first degree murder." *Id*. at 305. With respect to the defense theory that Petitioner shot but did not kill Marilyn, the defense asserted that Tiffnie, using the .22 caliber pistol, shot and killed her mother after Petitioner had non-fatally shot Marilyn with the Remington rifle. *See State's Lodging H-1* at 43 ("The theory of the defense at trial and in preparation for trial was that Tiffinie Arbaugh discharged a .22 caliber pistol that resulted in the death of Marilyn Arbaugh.").

The trial included substantial forensic evidence. Marilyn had been shot at least

fifteen times and "died from gunshot wounds to the chest." *Charboneau V*, 395 P.3d at 386. All of the bullets that were recovered "came from a Remington .22 Rifle, and all but one of the bullets analyzed [were] determined to have been fired from the specific rifle retrieved at the crime scene and which [Charboneau] … admitted to using." *Id*. at 386–87. This specific rifle was the Remington rifle that Petitioner had purchased in Gooding three days before the murder.

The remaining bullet, identified as bullet "C," "was determined to have *probably* been fired from" that specific Remington rifle, though "the ballistics expert could not state absolutely" that is was not fired from some other Remington rifle. *Id*. at 387 (emphasis added). However, the ballistics expert definitively concluded that the "C" bullet "was *not* fired from the Ruger .22 pistol that had also been recovered from the scene"—the .22 pistol that had discharged when Marilyn's daughters were behind the sheep wagon and that the defense suggested was used by Tiffnie to shoot Marilyn. *Id*. (emphasis added).

The pathologist who performed Marilyn's autopsy testified that three of the gunshot wounds to Marilyn's chest were potentially fatal, as at least one of them—the pathologist could not be sure which—severed Marilyn's autonomous artery. *Id*. The pathologist determined that the most likely scenario was that "the body was in multiple positions during the process of the shootings." *Id*. The pathologist also testified that Marilyn "had not been shot in the head." *Id*.

The jury found Petitioner guilty of first-degree murder.[4] Petitioner was initially

---

[4] The kidnapping and grand theft charges were dismissed at the close of the prosecution's case.

sentenced to death. The Idaho Supreme Court affirmed the conviction, as well as the denial of Petitioner's first and second post-conviction petitions, but it reversed Petitioner's death sentence. *Charboneau I*, 774 P.2d at 324. Petitioner was later resentenced to fixed life imprisonment. *State v. Charboneau*, 861 P.2d 67, 68 (Idaho 1993) (*Charboneau II*).

Petitioner then filed his first federal habeas petition. This Court denied habeas relief, and the Ninth Circuit Court of Appeals affirmed. *See Charboneau v. Klauser*, 107 F.3d 15, *1 (9th Cir. Feb. 7, 1997) (unpublished).

In May 2002, Petitioner returned to state court and filed a third petition for post-conviction relief. *State's Lodging F-1* at 5–30. The petition alleged a conspiracy of state actors, including prosecutors and police, to ensure a guilty verdict against Petitioner. Some of the actions of the alleged conspirators included hiding evidence and instructing Marilyn's daughter Tira on what to say—and what not to say—in her trial testimony. *Id*. at 52–54.

In support of this third post-conviction petition, Petitioner's mother asserted Tira had told her that Tira had been instructed to testify falsely. Petitioner's mother claimed that Tira's statements to her "were made … at the trial and sentencing"; the state district court later found it "highly unlikely that[,] if in fact such statements were made [at that time,] that [Petitioner's mother] herself would have withheld such information from her son or his attorney." *State's Lodging H-1* at 52.

The post-conviction court denied Petitioner's third post-conviction petition as untimely and not supported by admissible evidence. *State's Lodging F-1* at 90–92. The Idaho Supreme Court vacated and remanded, concluding that the state district court should

have first ruled on Petitioner's request for counsel. *Charboneau v. State*, 102 P.3d 1108, 1112–13 (Idaho 2004) (*Charboneau III*). On remand, after appointing counsel to represent Petitioner, the state district court again dismissed the petition. *State's Lodging H-1* at 43–64. The Idaho Supreme Court affirmed on timeliness grounds. *Charboneau v. State*, 174 P.3d 870 (Idaho 2007) (*Charboneau IV*).

Petitioner filed a fourth post-conviction petition. The state district court dismissed the petition as untimely and also denied some claims on the merits. *State's Lodging L-15*. Petitioner appealed, but the appeal was dismissed after Petitioner failed to pay the filing fees.[5] *State's Lodging M-3 through M-13*.

In 2011, Petitioner filed a fifth post-conviction petition based on newly discovered evidence and asserting a claim under *Brady v. Maryland*, 373 U.S. 83 (1963).[6] *State's Lodging J-1* at 20–77, 134–93. The petition was based on evidence that Petitioner received on March 18, 2011.

On that date, a correctional officer brought Petitioner a large envelope containing several documents. The officer had found the envelope in one of the prison offices and realized that the documents therein pertained to Petitioner.

The large envelope contained the following relevant documents: (1) a photocopy of

---

[5] The state district court had recommended denial of Petitioner's request for waiver of fees, finding that the appeal was frivolous.

[6] *Brady* held that the prosecution has a duty to disclose evidence favorable to the defense that is material to guilt or punishment, regardless of whether the defense has requested such evidence. A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the prosecution must have suppressed the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

a letter dated September 7, 1989 and written by Tira, who by that point was deceased (the "Tira Letter"); (2) a typed statement—in the form of an affidavit but not notarized—signed by former Jerome County Sheriff Larry Gold, who also was deceased by that point (the "Gold Statement"); (3) a statement purportedly written by former deputy sheriff Orville Balzer (the "Balzer Statement"), which the parties agreed (and the state court found) was a forgery; (4) a note dated June 27, 2003 and written by DeWayne Shedd, a prison employee who worked in the library (the "Shedd Note"); and (5) purported emails between Shedd and another prison official, discussing a plan to intercept Petitioner's mail (the "Shedd Emails"), which the state courts found were not genuine. *See Charboneau V*, 395 P.3d at 381–82, 387–89; *see also State's Lodging J-7* at 139 (lower post-conviction court stating, "[A]lthough these emails … may not be true and genuine, they were prepared or doctored by someone with access to IDOC computers and email.").

The state district court held an evidentiary hearing on Petitioner's fifth post-conviction petition. *See State's Lodging J-19*. The court then entered findings and conclusions determining that the Tira Letter was suppressed by the state; the court left open the question of materiality until a later date. *State's Lodging J-7* at 109–43. After further briefing, the district court granted post-conviction relief and ordered a new trial. *State's Lodging J-11* at 523–81. The state appealed.

The Idaho Supreme Court reversed. That court held that the fifth post-conviction petition (1) was untimely, (2) was procedurally barred because the same claims (if not the same evidence) had previously been presented in Petitioner's third post-conviction

petition, and (3) failed on the merits because the new evidence, particularly the Tira Letter, was not material under *Brady*. *Charboneau V*, 395 P.3d at 389–92.

In the instant successive habeas petition, Petitioner asserts five claims, all of which are based on the same evidence that Petitioner presented in his fifth state post-conviction petition, primarily the Tira Letter. As explained more fully below, the Tira Letter states that various state actors instructed Tira to dispose of evidence, to lie about what happened on July 1, 1984 (including in her trial testimony), and to implicate only Petitioner in the crime. Petitioner asserts that the information in the Tira Letter supports his claim that Tiffnie killed Marilyn. The other evidence discovered in the large envelope, if authentic and true, supports Petitioner's claim that governmental officials conspired to intercept, and cover up the existence of, the Tira Letter.

Claim 1 asserts that the prosecution violated *Brady v. Maryland* by failing to disclose to Petitioner, before or during his original trial, evidence that was favorable and material. Because the Tira Letter was dated years after the trial, the alleged *Brady* material is not the letter itself, but rather the *information* in the letter—that various state actors encouraged Tira to lie in written statements, to dispose of evidence, and to testify falsely at trial.

In Claim 2, Petitioner asserts the prosecution did not satisfy its burden of proving that Petitioner was guilty of first-degree murder.

Claim 3 asserts that Petitioner is actually innocent.[7]

---

[7] A freestanding claim of actual innocence is not cognizable in a noncapital federal habeas corpus case. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993); *Stephenson v. Blades*, 2014 WL 3509448, at *7 (D. Idaho

In Claim 4, Petitioner argues that his resentencing hearing was unfair because the state failed to disclose the evidence regarding Tira's allegedly perjured trial testimony, which Petitioner could have used to file a motion for a new trial.

Finally, Claim 5 asserts prosecutorial misconduct.

For the following reasons, the Court agrees with Respondent that all five claims must be dismissed because Petitioner has not satisfied 28 U.S.C. § 2244(b)(2).

## DISCUSSION

The Rules Governing Section 2254 Cases ("Habeas Rules") authorize the Court to summarily dismiss a petition for writ of habeas corpus when "it plainly appears from the face of the petition and any attached exhibits," as well as those records subject to judicial notice, "that the petitioner is not entitled to relief in the district court." Habeas Rule 4; *see* Fed. R. Evid. 201; *Dawson*, 451 F.3d at 551 n.1. Where appropriate, a respondent may file a motion for summary dismissal, rather than an answer. *White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989).

## 1.    Standards of Law Governing Successive Petitions

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally prohibits a petitioner from filing a successive habeas petition that challenges the same conviction as the petitioner's first federal habeas petition. *See Tyler v. Cain*, 533 U.S. 656, 661 (2001) ("AEDPA greatly restricts the power of federal courts to award relief to state prisoners who file second or successive habeas corpus applications."). Any claim in a

---

July 14, 2014) (unpublished). Therefore, Claim 3 is subject to dismissal regardless of whether Petitioner can satisfy § 2244(b)(2).

successive petition that was presented in the first petition must be dismissed. 28 U.S.C. § 2244(b)(1). As for claims that were *not* presented in the first petition, a federal court may not consider such claims unless the petitioner meets one of two exceptions.

The first exception is for claims based on new rules of constitutional law that have been made retroactive by the United States Supreme Court. 28 U.S.C. § 2244(b)(2)(A). This first exception is not implicated in the instant case.

The second exception allows a petitioner, in certain circumstances, to assert a successive claim that relies on newly discovered evidence. The petitioner must establish both that

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the [petitioner] guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B). The Court will refer to subsection (b)(2)(B)(i) as the "diligence" prong and subsection (b)(2)(B)(ii) as the "actual innocence" prong, which is also sometimes referred to as the miscarriage-of-justice prong.

Consistent with its statutory purpose of limiting the availability of habeas relief in successive petitions, AEDPA provides for two different gatekeepers for such petitions. The first gatekeeper is the federal appellate court: a petitioner may not file a successive petition unless authorized to do so by the circuit court of appeals. 28 U.S.C. § 2244(b)(3). The court of appeals may grant such authorization only if the petitioner makes a "prima facie

MEMORANDUM DECISION AND ORDER - 11

showing" that at least one claim in the petition satisfies a § 2244(b)(2) exception. *Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997) (per curiam). This prima facie showing is not difficult to make—it is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court." *Id.* (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)).

The Ninth Circuit has authorized the filing of Petitioner's successive petition. However, that does not necessarily mean this Court may consider the merits of Petitioner's claims.

A district court considering a successive petition must act as the *second* gatekeeper and must undertake its own § 2244(b)(2) analysis. *See* 28 U.S.C. § 2244(b)(4) ("A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section."); *Cox v. Powers*, 525 F. App'x 541, 542 (9th Cir. 2013) (unpublished) ("We previously determined that Cox made a prima facie showing and granted him leave to file his second petition in the district court. That earlier determination did not, as Cox argues, preclude the district court from nonetheless dismissing his petition for failing to satisfy § 2244(b)(2).") (citing 28 U.S.C. § 2244(b)(4) and *United States v. Villa-Gonzalez*, 208 F.3d 1160, 1164 (9th Cir. 2000)).

The standard that a district court employs when considering whether a petitioner's claim satisfies § 2244(b)(2) is stricter, and more difficult for a petitioner to meet, than the mere prima facie showing required to obtain filing authorization from the court of appeals. At this second gatekeeping stage, the petitioner must go further and "actually 'show' that

the claim satisfies the standard" of § 2244(b)(2). *Tyler*, 533 U.S. at 661 n.3 (2001) (alteration omitted).

That is, to consider the merits of successive claims under § 2244(b)(2)(B), a federal district court must conclude that no reasonable factfinder would have found the petitioner guilty absent the alleged constitutional error. Petitioners attempting to make this actual innocence showing must bring forth "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (statute of limitation context).

Additionally, the actual innocence showing required by § 2244(b)(2)(B) is stricter than the actual innocence exception applied in other habeas contexts, such as procedural default and the statute of limitations. The § 2244(b)(2)(B) standard is more difficult to satisfy in that it requires (1) diligence, and (2) clear and convincing evidence—not just a preponderance of the evidence—that no reasonable factfinder would have found the petitioner guilty. *See generally McQuiggin v. Perkins*, 569 U.S. 383 (2013) (statute of limitations context); *Schlup v. Delo*, 513 U.S. 298 (1995) (procedural default context); *see also McQuiggin*, 569 U.S. at 396 (describing § 2244(b)(2)(B) as "reflect[ing] Congress' will to modify the miscarriage of justice exception with respect to second-or-successive petitions") (emphasis omitted); *Calderon v. Thompson*, 523 U.S. 538, 558 (1998) ("It is true that the miscarriage of justice standard … [for purposes of recalling a mandate] is somewhat more lenient than the standard in § 2244(b)(2)(B).").

Stated in the positive, Petitioner must establish—by clear and convincing

evidence—that, given all of the evidence, *every* reasonable juror would vote to acquit. This showing is exceptionally difficult to make, and § 2244(b)(2)(B)(ii) "permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (discussing the more lenient *Schlup* standard) (internal quotation marks omitted).

The Court must determine whether a petitioner has satisfied the actual innocence prong "in light of the evidence as a whole." 28 U.S.C. § 2244(b)(2)(B)(ii). The Court must consider "all the evidence, old and new, incriminating and exculpatory, admissible at trial or not." *Lee*, 653 F.3d at 938 (internal quotation marks omitted) (discussing the more lenient *Schlup* standard).

In federal habeas proceedings, factual findings of state courts are presumed correct and are binding on the federal court unless those findings are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Even implicit factual findings of a state court are entitled to the presumption. *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990); *see also Ford v. Davis*, 910 F.3d 232, 235 (5th Cir. 2018) ("As long as there is some indication of the legal basis for the state court's denial of relief, the district court may infer the state court's factual findings even if they were not expressly made.") (internal quotation marks omitted); *Taylor v. Horn*, 504 F.3d 416, 433 (3d Cir. 2007) ("Implicit factual findings are presumed correct under § 2254(e)(1) to the same extent as express factual findings.").

This presumption of correctness applies to a state court's factual findings as to the reliability and credibility of evidence presented in state court proceedings, even if those findings relate to a procedural issue. *Kirkpatrick v. Chappell*, 950 F.3d 1118, 1131 (9th

Cir. 2020) ("Unlike § 2254(d), § 2254(e)(1)'s application is not limited to claims adjudicated on the merits. Rather, it appears to apply to all factual determinations made by state courts."); *see also Mubita v. Blades*, No. 1:08-CV-00310-BLW, 2015 WL 2064476, at *13 (D. Idaho May 4, 2015) ("[S]tate court findings of fact should be presumed correct in federal habeas corpus procedural settings."); *Fields v. Blades*, No. 1:95-CV-00422-EJL, 2015 WL 1481397, at *8 (D. Idaho Mar. 31, 2015) (unpublished) ("[A] state court's factual findings as to the reliability and credibility of the evidence presented in state postconviction proceedings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), even if they relate to a procedural default issue."); *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) (stating that, although § 2254(d) "has no application in [a procedural default] context," § 2254(e)(1) does apply, "because it refers to the 'determination of a factual issue'—that is, to a state court's findings of fact, rather than its conclusions of federal law").

Therefore, the presumption of correctness applies to the Idaho state court's findings with respect to the evidence Petitioner has presented in support of his successive petition, even though the merits of Petitioner's current habeas claims are not at issue at this time.

## 2.   The Successive Petition Does Not Satisfy the Requirements of 28 U.S.C. § 2244(b)(2)(B)

The Court will assume, without deciding, that Petitioner acted diligently for purposes of § 2244(b)(2)(B)(i).[8] However, under § 2244(b)(2)(B)(ii), Petitioner has not

---

[8] The Court appreciates the parties' supplemental briefing on the diligence prong, which was submitted according to the Court's previous Order. *See* Dkt. 46. However, the Court finds that the diligence inquiry in this case involves complicated questions of fact and law that need not be addressed.

established that, considering all of the evidence—including the new evidence—no reasonable factfinder would have found him guilty beyond a reasonable doubt.

### A. *Tira's Trial Testimony*

Given that the Tira Letter is the primary evidence relied on by Petitioner in asserting actual innocence under § 2244(b)(2)(B)(ii), Tira's trial testimony is extremely important in considering the reliability of the Tira Letter. Years before the date of the Tira Letter, Tira—who was fourteen years old when her mother was killed—testified as follows:

> At Charboneau's criminal trial, Tira testified that on the day of her murder, Marilyn had taken a bath and gone out to make a telephone call to her mother and father. They did not have a telephone in their house. The telephone was in the nearby shop that was used by the man who farmed the land. Tiffnie was on her bed reading, and Tira was going to bathe after her mother. As Tira was running the bath water, her mother came back into the house and asked Tira if she had put the horses in a different corral. Tira stated that she had not, and her mother went back outside. The water was still running, Tira heard a yell, and then heard Tiffnie jump off her bed onto the floor. Tira continued bathing, and a short while later Tiffnie came into the bathroom and said really fast in a scared, shaky tone of voice: "Tira, Jaimi's outside and he shot Mom. Get out of the bathtub and hurry up."

> Tira ran into her room and hurriedly put [on] a pair of pants and a shirt, which were too big for her because they belonged to Tiffnie's boyfriend, Bart, who lived with them. She then put on his boots that were also too big. She testified that Tiffnie grabbed their mother's .22 caliber pistol while Tira was dressing, although she did not actually see Tiffnie grab the pistol. Tira stated that the pistol was kept behind the radio on their mother's bedstead and that she had seen it there the night before.

> Tira then testified:

A. Well, we ran out behind the sheep wagon. Tiffy told me not to go past it, and we were yelling but—

Q. What were you yelling?

A. We were just—well, I just—we couldn't really hear anything or nothing. And Tiffy was kind of in front of me, and I was off to the side. My dog was sitting right next to me, and Tiffy was shaking really bad and she fired a shot, scared me, and it just went, almost hit my dog. And I heard the gravel hit the side of the barn and everything and Tiffy was really nervous, so we went back into the house. We went back into the house.

Q. Let me interrupt you. Before you went back into the house, what were you yelling as you were standing out by the sheep wagon?

A. We were just yelling to Mom. We were kind of being quiet, but we was yelling to mom. We was, you know, but we wasn't getting any reply, you know. We wasn't getting nothing.

Q. No reply?

A. Yeah.

On cross-examination, Tira gave more information regarding the shot fired by Tiffnie [behind the sheep wagon]:

Q. And did Tiffy have the pistol in her possession at that time …?

A. Yes.

Q. What did she do with it?

A. She just carried it out there.

MEMORANDUM DECISION AND ORDER - 17

Q. And is that when the shot went off the first time [when you went] to the sheep wagon?

A. Yes. We was behind the sheep wagon. Her hands were behind her back and she shot once.

Q. They you went back into the house?

A. Yes. We was scared. So we went back into the house.

When [Tiffnie and Tira] went back into the house, Tira changed into her own clothing. She testified that while doing so, she heard more shots.

Q. Okay. Did anything else happen while you were in the house changing clothes?

A. Well, yes. Right when I was putting my leg in my pants we heard several more shots, about five or so, five.

Q. You would say it's about five shots?

A. Yes.

Q. It would have been more or less?

A. Yes.

Q. Are you certain, you're not certain of the number?

A. No. I was too scared to be counting them.

Tira testified that she and Tiffnie ran back out of the house to the alleyway in the horse barn, where they found their mother lying on the ground. Tira was behind Tiffnie, so Tiffnie was the first one into the barn. Tira testified what she saw as follows:

Q. Where was Tiffy?

> A. Tiffy had my mom in her arms, and Tiffy pulled up her shirt or something, and we could see a lot of blood and stuff on her chest. And I just brushed my hand across her cheek because I didn't know what to do.
>
> Q. Across your mom's cheek?
>
> A. Yes. And right when I did that blood started running from her mouth and her nose, and Tiffy told me to go get an ambulance and I stood there for a second and then she said go, so I just got up and I ran out. And I called the ambulance....

*Charboneau V*, 395 P.3d at 382–83.

Tira also testified about the firearms kept on the property, "and she made no mention of the Remington rifle that Charboneau claimed to have given her." *Id*. at 383. "On cross-examination, Tira was asked twice whether her testimony was true, and both times she answered that it was." *Id*.

### B.    *Petitioner's Pretrial Hearing Testimony*

Before trial, Petitioner filed a motion to dismiss the kidnapping and grand theft charges. The court held a hearing on the motion, at which Petitioner testified.[9] The state supreme court's accurate factual description of the motion hearing, as well as Petitioner's testimony, is as follows:

> The district judge carefully advised Jaimi that he could not be required to testify and gave the defense attorney an opportunity to explain fully to Jaimi his right to remain silent. Jaimi confirmed to the district judge that he understood that he had

---

[9] Even though Petitioner did not testify at trial, this Court will consider his pretrial hearing testimony because all available evidence—whether admissible at trial or not—is relevant to whether Petitioner has shown actual innocence as required by § 2244(b)(2)(B)(ii). *See Lee*, 653 F.3d at 938; 28 U.S.C. § 2244(b)(2)(B)(ii) (stating that the actual innocence prong must be considered "in light of the evidence as a whole").

the right not to testify and that anything he said might be used
as evidence against him.

*Charboneau I*, 774 P.2d at 304.

Petitioner testified that he purchased the Remington rifle as a graduation present for

Tira, that he told Marilyn about it, and that Marilyn decided to remove the scope before

giving the Remington rifle to Tira. Petitioner also testified that he was staying in the tack

room on Marilyn's property for a few days prior to the murder, but that Marilyn's daughters

did not know this. *Charboneau V*, 395 P.3d at 384–85.

> Charboneau testified that Marilyn woke him up on Sunday
> morning at about 9:30 or 10:00 a.m. According to him, she said
> that she would tell her daughters that he was there and they
> could give Tira the rifle.
>
> …
>
> … Charboneau testified that [Marilyn] took the rifle to the
> house and returned with it five to fifteen minutes later [with the
> scope off] ….

*Id*. at 385.

Petitioner testified that, when Marilyn came back to the barn, "she had a handful of

bullets and loaded the [Remington] rifle." *Charboneau I*, 774 P.2d at 304. He testified that,

a short time later, "Marilyn picked up the rifle, pointed it at him, and told him that he was

dead and that no other woman was going to have him." *Id*. Petitioner heard a click,

indicating that Marilyn pulled the trigger but that the gun did not go off. Petitioner said he

then grabbed the Remington rifle and wrestled it away from Marilyn.

Petitioner continued,

> I got the gun from her and she turned around and ran down the alleyway. I was in right by the door, and she ran that way; and I heard the door slam, and I seen Tiffy coming. She was in her nightgown, and she had the pistol in her hand. And a few seconds later, when she was about halfway between me and the house, and I had [the Remington rifle] at my hip, and I didn't know if Marilyn was going to run around and get another gun or what; and I closed my eyes, and the gun went off. It went off—I don't know four or five times, I—I guess.
>
> I opened my eyes, and Marilyn was on her knees and she was bleeding from one leg and she was holding her hand on this shoulder near to her arm. And I ran down to her and stood right beside her and I said, "Gees, Marilyn, what are you wanting to shoot me for?"

*Charboneau V*, 395 P.3d at 385.

Petitioner stated that, "as he knelt beside Marilyn, Tiffnie came running toward them with a pistol saying, 'I hate both of you guys.'" *Charboneau I*, 774 P.2d at 304. Petitioner said that "Tiffnie fired the pistol two or three times and that [Petitioner] ran out of the barn"; when Petitioner "realized that Tiffnie was not coming after him[,] he eased back to the barn and heard Tiffnie talking to her mother." *Id.* at 304–05. Petitioner testified "that he saw Tiffnie standing above her mother, heard the pistol go off, and saw Marilyn's hair fly up," indicating that Tiffnie shot Marilyn in the head. *Id.* at 305.

Petitioner testified that after that shot, he "looked around to the edge of the barn[] and … heard Tiffy scream":

> A. … And I heard her run out of the way; she was screaming, her hands over her ears and—
>
> Q. Was the [pistol] still in her hand?

> A. Yes, it was still in her hand, yes; and then as soon as she was gone, I ran back in there, and I picked up the gun, the [Remington] rifle.
>
> Q. Why did you go back to pick up the [Remington rifle]?
>
> A. Because I knew that Tiffy had probably, if she didn't call an ambulance, she called Jim Arbaugh; and I have never liked him anyway, and we have never gotten along, and I knew that he was possible of things way before this ever happened. So I grabbed that gun. I didn't want to have anybody give me— shooting at me, and I didn't want to shoot at anybody. I grabbed that gun. And I ran back out of the barn, and I got the gun …. And I ran about 200 yards to a wheat field where I waited for the police to arrive.

*Charboneau V*, 395 P.3d at 386.

In sum, Petitioner testified that Tiffnie killed Marilyn by shooting her, including in the head, with the .22 caliber pistol—not with the Remington rifle.[10]

### C.    The New Evidence: Tira Letter, Gold Statement, Balzer Statement, Shedd Note, and Shedd Emails

The Idaho Supreme Court's findings regarding the content, authenticity, and reliability of the new evidence at issue in this case have not been rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state supreme court accurately described that new evidence as follows.

First, the Tira Letter:

> The large envelope [delivered to Petitioner by the correctional officer in 2011] contained a photocopy of a letter written by Tira to Judge Becker ("Tira Letter"), who presided over

---

[10] Petitioner later "confirmed that it had been his desire to testify at the hearing on the motion to dismiss, that the decision to do so was a joint decision between him and the defense attorney, and that he agreed that was the best thing to do." *Charboneau I*, 774 P.2d at 305. The state district court denied Petitioner's pretrial motion to dismiss the grand theft and kidnapping charges, but it ended up dismissing those charges at trial after the prosecution failed to prove venue. *Id*.

> Charboneau's criminal trial, and a photocopy of the envelope
> in which it was allegedly mailed to Judge Becker. In the letter,
> she claimed that she had been pressured by the prosecutor and
> a detective to testify falsely at Charboneau's trial and that it
> was Tiffnie, not Charboneau, who fired the fatal shot killing
> their mother.… The envelope bore a postmark from Bruneau,
> Idaho, dated September 7, 1989, and a return address of 622
> Highland Rd., Jerome, Idaho.
>
> However, the letter and envelope were photocopies, not the
> originals. Who made the photocopies is unknown, and is it not
> known when those photocopies were made or who provided
> them. Charboneau's expert testified that "all photocopies can
> be manipulated in some fashion." ….

*Charboneau V*, 395 P.3d at 381–82. The Tira Letter also states, "'I am in Bruneau Idaho

for a cowboy benefit + street dance where the Pinto Bennetts band is providing the music'

and 'I will be back in Jerome early next week.'" *Id*. at 382.

The state supreme court found that the street dance to which the letter referred did

not occur until ten days after the date of the letter, which was inconsistent with the letter's

statement that Tira would be back in Jerome "early next week." *Id*. The court also found

that the information in the Tira Letter was contradicted by the testimony of Tira's husband

(who was also Petitioner's half-brother):

> Tira's husband testified that in September of 1989 he and Tira
> were living on a ranch in Wells, Nevada [not Jerome, Idaho,
> which was the return address on the envelope of the Tira
> Letter]; that he was working on the ranch and she usually
> worked with him; that they did not have a car; that he had never
> been to a street dance in Bruneau; that during their marriage he
> and Tira had never spent the night apart except for one week
> during Christmas of 1989; that she signed the letter with her
> maiden name, which she had not used as long as he had known
> her; and that by September 1989 they had a child.

*Id*.

The Idaho Supreme Court did not adopt the district court's finding that Tira's husband's testimony was not credible but, instead, called that negative credibility finding into question. The supreme court stated, "The district court wrote, 'For a variety of reasons, the Court does not accept (and in fact rejects) his testimony,' but the court did not state what those reasons were." *Id*. This constitutes an implicit factual finding by the Idaho Supreme Court that Tira's husband's testimony was, in fact, credible.

The Tira Letter states that Tira "was told by an officer to write some things in her written witness statement that were not true," specifically:

> [The Tira Letter] asserted that the officer told [Tira] to write a specific time for when she woke up on the morning her mother was killed, and she did not know what time it really was. She then wrote that … "after mom woke up that morning I remember her asking Jamie [sic] to go out + check on our horse that had been to the vet a few days earlier." According to the letter, before Charboneau went outside, her mother gave her a .22 caliber rifle [the Remington rifle] that was a graduation gift from her and Charboneau.
>
> …
>
> Tira then wrote that she told the officer when she first heard her mother screaming, she was screaming for Tiffnie. Tira was still in the bathtub, and Tiffnie came running into the bathroom and screamed at Tira to get dressed. Tiffnie grabbed the Remington rifle and gave Tira their mother's .22 caliber pistol. Tira described what occurred then as follows:
>
>> I followed Tif over behind the sheep wagon which was right across the driveway from the barn. We could see mom in the alleyway by the feed corrals but I did not see Jaimi. I could only hear his voice. I remember I heard Tif shoot the rifle while we were behind the sheep wagon. I remember this because it startled me so much

MEMORANDUM DECISION AND ORDER - 24

> that I accidently fired mom's pistol which also scared me.

> Tira wrote that she then asked Tiffnie what was going on, and she answered that their mother had taken her own .22 caliber rifle with her when she went outside to help Charboneau. [Tira] asserted that she told the officer that, and he said he would make a note of it, but it was not necessary for Tira to write down every little thing in her statement.

*Id*. at 384.

The Tira Letter goes on to assert that, "a few days later, another officer came to [Tira] and stated that she had forgotten to write about hearing more shots after she and Tiffnie had gone back into the house." *Id*. This officer told Tira to write another statement about the extra shots and that Tira signed the statement "even though it was not true." *Id*.

The Tira Letter also claims that "a prosecutor told [Tira] to get rid of her mother's .22 rifle"—the rifle that the Tira Letter claimed Marilyn had taken with her when she left the house. *Charboneau V*, 395 P.3d at 384. The letter states that Tira, her grandfather, and her uncle "buried the rifle on the property, right behind a potato cellar." *Id*. According to the Tira Letter, Tira's uncle had previously hidden other things belonging to Marilyn, pursuant to the prosecutor's instructions, and that Tira and others were told not to mention this.

In sum, with respect to events on the day of the murder, the Tira Letter claims (1) that Petitioner was in the house that morning and that he and Marilyn gave Tira the Remington rifle; (2) that Marilyn had a different rifle with her when Marilyn left the house and, presumably, when she encountered Petitioner; (3) that Tiffnie—not Charboneau—had possession of the Remington rifle; (4) that Tiffnie fired the Remington rifle when the girls

were behind the sheep wagon; and (5) that Tira—not Tiffnie—had possession of the .22 caliber pistol when it accidentally discharged. Petitioner relies on the Tira Letter for the proposition that Tiffnie shot and killed Marylin, with the Remington rifle, when the girls were behind the sheep wagon.

> Second, the Gold Statement:

> > The large envelope contained a typed statement signed by Larry Gold ("Gold Statement"), a former Jerome County Sheriff, in which he stated that his then Chief Deputy, Mito Alanzo [sic], had told him that the elected clerk was in possession of a letter that had been mailed to the Jerome County courthouse; that the letter was addressed to the presiding judge in Charboneau's case; that it had been sent "by Tira Arbaugh, the daughter of Marilyn Arbaugh"; that "the subject matter of this letter had significant relevance concerning the Charboneau case"; and that "Chief Deputy Alanzo [sic] stated that his concern was that the District Court Clerk ... had requested that he help her to destroy the letter." In his statement, Mr. Gold also said that he had spoken with the Jerome County prosecutor about the clerk's possession of the letter and the "allegations made by Chief Deputy Alanzo [sic] that Cheryl Watts was conspiring to destroy the letter."

*Id*. at 387 (alterations in original). The Gold Statement explains how, if the Tira Letter had actually been sent to Judge Becker, the judge did not receive it: the letter was intercepted by the clerk.

> Third, the Balzer Statement:

> > The large envelope contained a handwritten statement purporting to be signed by Orville Balzer ("Balzer Statement"), who was a former Jerome County deputy sheriff. The Balzer Statement began, "Letter from Tira Arbaugh/daughter of Marilyn Arbaugh. Letter addressed to Judge Philip Becker." It then stated that the postmark on the envelope "indicates the letter was mailed from Bruneau Idaho on September 7, 1989, A.M." and that the letter was given to "Judge Becker's court

> clerk Cheryl Watts" on September 11, 1989. The statement
> asserts that the "Writer witnessed Cheryl Watts open the
> envelope and read the letter enclosed"; that the "writer"
> advised her not to shred the letter because that may invite a
> federal investigation; that a better solution would be "to simply
> lose the letter in a 'ghost' file"; and that the "writer" later
> discussed the matter with Chief Deputy Mito Alanzo, who
> replied: "'I'm not suprised [sic]. Just another example of
> Jerome Counties [sic] gunsmoke style justice, remember the
> Melvin Wright thing.'"

*Id*. at 388 [alterations in original].

The parties agreed that the Balzer Statement was a forgery. The state district court found that it was actually written by compromised prison employee DeWayne Shedd, who forged the Balzer Statement "to assist Charboneau to support the contention that the Tira Letter was intercepted by the elected clerk." *Id*. The court also found credible Shedd's testimony that he did not know who Tira Arbaugh, Orville Balzer, Cheryl Watts, or Mito Alonzo were, "even though he named all of them in the Balzer Statement that he had forged." *Id*. The Idaho Supreme Court found that "[s]omeone directed Mr. Shedd regarding what to write when forging the Balzer Statement in order to benefit Charboneau and to lend credence to the assertion that the elected clerk diverted the Tira Letter." *Id*. The court concluded that "the only person who could have done so was Charboneau." *Id*.

<u>Fourth, the Shedd Note</u>:

> The large envelope also included the original of a note written
> by DeWayne Shedd ("Shedd Note"). In the note dated June 27,
> 2003, Mr. Shedd wrote that he had been instructed by a deputy
> attorney general to monitor all of Charboneau's personal mail
> and his incoming and outgoing legal mail; to look for and seize
> a letter arriving at the Orofino correctional facility to
> Charboneau from Larry Gold, without notifying Charboneau;
> to look for and confiscate any documents "depicting the name

Tina Arbaugh" [as Shedd thought Tira's name was Tina,] and immediately notify the deputy attorney general, or if he is not available then contact "another attorney Mark Haws at the Federal Court Building."

*Id*. at 388–89 (footnote omitted).

Shedd testified that he did not know who Haws was and displayed "an amazing lack of memory regarding the note." *Id*. at 389. The Idaho Supreme Court found that Shedd placed the note, along with the Balzer Statement that Shedd had forged, into the large envelope before that envelope was discovered in 2011. The Shedd Note and the Balzer statement "were obviously not in Charboneau's mail that was allegedly intercepted." *Id*.

<u>Finally, the Shedd Emails:</u>

There were also two e-mails allegedly from Mr. Shedd to a superior regarding intercepting Charboneau's mail. The district court had those e-mails and the Idaho Department of Correction's e-mail system examined by an expert. In its report, the expert wrote, "Based on other emails found on the system, there is no reasonable scenario that results in these emails being genuine." The expert also wrote that "hardware and word processing software at the ICIO [Idaho Correctional Institution-Orofino] offices were capable of making the changes seen in the emails" and that "[t]he emails in question could have been copied and pasted into any word processor and modified to produce the results we see."

*Id*. (alterations in original).

The state district court found that the emails were not prepared "by anyone friendly to Charboneau" and that "there [was] no explanation as to how Charboneau accomplished that feat." *Id*. But the Idaho Supreme Court disagreed with these findings, stating that "Shedd had access to the e-mail system" and noting that Shedd had also forged the Balzer Statement in an effort to benefit Petitioner. *Id*. This is an implicit factual finding that Shedd

forged the emails in yet another attempt to help Petitioner with his case.

### D.   Petitioner Has Not Shown by Clear and Convincing Evidence That, in Light of All the Evidence, Every Reasonable Juror Would Vote to Acquit

As an initial matter, the Idaho Supreme Court found that the Balzer Statement and the Shedd Emails were not genuine but, instead, were forged by Shedd in an attempt to cast doubt on Petitioner's guilt. Petitioner has not rebutted that finding by clear and convincing evidence, and the Court is thus bound by it. *See* 28 U.S.C. § 2254(e)(1).

The Gold Statement and the Shedd Note, if true, explain how the Tira Letter was suppressed by various state actors over the years. As such, the Gold Statement and the Shedd Note do not constitute independent evidence that Petitioner is innocent—only that state actors conspired against Petitioner, by committing misconduct in their investigation and prosecution of Petitioner and by intercepting and covering up the existence of the Tira Letter. The evidence supporting Petitioner's claim of actual innocence—that Tiffnie, not Charboneau, killed Marilyn—is the information in the Tira Letter itself.

As previously explained, § 2244(b)(2)(B)(ii) requires Petitioner to establish by clear and convincing evidence that, if the information in the Tira Letter had been presented at trial, every reasonable juror would vote to acquit. He has not done so.

As an initial matter, the Tira Letter's claims about events the day of the murder are suspect because, as the Idaho Supreme Court found, Tira's husband credibly testified that other information in the letter was wrong. A reasonable juror could have relied on the falsity of some aspects of the letter, such as the return address, as a reason to reject the other allegations in the Tira Letter.

Additionally, as the Idaho Supreme Court correctly found, the Tira Letter is inconsistent with the version of events that Petitioner told at the pretrial motion hearing:

> Tira wrote that Charboneau was in the house on the morning that Marilyn was killed. Charboneau's version was that he was not in the house, but had been staying in the tack room. Tira wrote that Marilyn and Charboneau gave her the Remington rifle that morning. Charboneau's version was that Tira was never given the [Remington] rifle; he had it in the tack room until Marilyn took it for five to fifteen minutes to remove the scope and then returned to the tack room with the rifle. Tira wrote that Tiffnie took [the Remington] rifle, gave her their mother's .22 pistol, and they both went outside and hid behind the sheep wagon. Charboneau's version was that only Tiffnie came out of the house; she had a .22 pistol, not the [Remingtonn] rifle; and she did not hide behind the sheep wagon. Tira wrote that while she and Tiffnie were behind the sheep wagon, she heard Tiffnie shoot the [Remington] rifle. Charboneau's version was that Tiffnie shot her mother with a .22 pistol while standing over her. Tira wrote that Tiffnie had [the Remington] rifle. Charboneau's version was that he had the [Remington] rifle and took it with him when he ran into the wheat field, where he threw it into the field.

*Charboneau V*, 395 P.3d at 386. Thus, the Tira Letter directly conflicts with Petitioner's story in many material respects. Given these inconsistencies, reasonable jurors could have decided not to credit either version of events.

Further, Petitioner's testimony at the motion hearing is not only inconsistent with the Tira letter, but it is also blatantly contradicted by the forensic evidence. That evidence established that Marilyn was not shot with a pistol at all, nor was she shot in the head. The scientific evidence simply does not support the version of events Petitioner told at the motion hearing—that Tiffnie shot Marilyn in the head with the .22 pistol.

Finally, the Tira Letter is markedly different from Tira's testimony at trial, especially with respect to the guns. Tira testified that Tiffnie initially grabbed the .22 pistol, but after it discharged accidentally, the girls went back into the house and left the pistol there. But, the Tira Letter claims that Tiffnie possessed and fired the Remington rifle and that Tira herself had the .22 pistol. And, again, Petitioner's testimony was that Tiffnie *never* had the Remington rifle, which Petitioner supposedly wrestled away from Marilyn and took with him when he fled the barn.

Given all of this contradictory evidence, a reasonable juror could have chosen to believe the forensic evidence and Tira's trial testimony, instead of the statements in the Tira Letter or Petitioner's testimony at the pretrial motion hearing. The Court simply cannot conclude, in light of all the evidence, that every reasonable juror would vote to acquit Petitioner of first-degree murder. Therefore, Petitioner has not satisfied the actual innocence prong of § 2244(b)(2)(B), and the instant successive petition must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court will dismiss Petitioner's successive habeas petition as barred by 28 U.S.C. § 2244(b)(2)(B).

## ORDER

**IT IS ORDERED:**

1.    Petitioner's Special Motion for Extension of Time (Dkt. 60) is GRANTED.

2.    Petitioner's Motion for Expedited Injunction (Dkt. 62) is DENIED.

3.    Petitioner's Motion to Disqualify and Impeach Counsel for the State (Dkt. 65) is DENIED.

4.     Respondent's Motion for Summary Dismissal (Dkt. 41) is GRANTED, and Petitioner's successive petition for writ of habeas corpus is DISMISSED with prejudice.

5.     The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Habeas Rule 11. If Petitioner wishes to appeal, he must file a timely notice of appeal with the Clerk of Court. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED: September 23, 2020

David C. Nye
Chief U.S. District Court Judge